# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

NICHOLAS A. GHAPHERY, D.O.,
as Personal Representative of the ESTATE
OF AUSTIN GHAPHERY
Plaintiff Below, Petitioner

**FILED**
**November 16, 2023**

EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

vs.)     No. 22-ICA-150     (Cir. Ct. Ohio Cnty. No. CC-35-2019-C-182)

WHEELING TREATMENT CENTER, LLC, and
JOHN SCHULTZ, M.D.,
Defendants Below, Respondents

## MEMORANDUM DECISION

Petitioner, Nicholas A. Ghaphery, D.O. in his capacity as the administrator and personal representative of the estate of Austin Nickalus Ghaphery, his deceased son, appeals the Circuit Court of Ohio County's September 21, 2022, order granting summary judgment in favor of Respondents, Wheeling Treatment Center, LLC ("WTC") and its Medical Director John Schultz, M.D. ("Medical Director").[1] The circuit court found that Austin was not a "patient" pursuant to the Medical Professional Liability Act ("MPLA"), and therefore, WTC and its Medical Director did not owe a duty of care towards Austin when he was denied acceptance into the special purpose medication assisted treatment program on September 28, 2017.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022). After considering the parties' written and oral arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no abuse of discretion. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

This is a medical negligence action brought by a personal representative of an estate for his deceased son, Austin, alleging that WTC and its Medical Director failed to meet the required standards of care relating to Austin's pre-admission initial assessment and suicide risk evaluation. The personal representative further alleges that, as a result of WTC's and the Medical Director's failure to meet the appropriate standards of care, they proximately caused the death of Austin on November 3, 2017.

---

[1] Petitioner is represented by Patrick S. Cassidy, Esq. Respondents are represented by Rita Massie Biser, Esq. and Lynnette Simon Marshall, Esq.

1

WTC operates a medication assisted treatment program governed by the Medication-Assisted Treatment Program Licensing Act. *See* W. Va. Code § 16-5Y-1 *et seq.*; W. Va. Code R. § 69-11-1 *et seq.* In accordance with the Act, WTC provides medication, combined with counseling, to treat individuals recovering from opioid addiction. WTC only treats opioid addiction in connection with recovery; it is not a crisis stabilization facility, an inpatient psychiatric facility, or a comprehensive mental health center.

In the months before Austin's presentation at the WTC, he was showing signs of drug abuse. On July 13, 2017, Austin was found in a disoriented and later unresponsive state at his girlfriend's apartment. Law enforcement and emergency medical technicians were called to the scene and determined that Austin was under the influence of opioid medications.[2] At the request of his parents, Austin began treatment with a primary care physician, John Schmitt, M.D., on July 18, 2017. According to Dr. Schmitt's treatment notes, Austin denied a drug problem when he was examined. However, in Dr. Schmitt's deposition, he testified that Austin's mother discussed with Dr. Schmitt the possibility that Austin should be drug tested. Dr. Schmitt testified that Austin declined a drug test.

Austin was seen a second time by Dr. Schmitt on September 21, 2017. According to Dr. Schmitt's treatment note, Austin admitted to depression, anxiety, mood swings and suicidal ideations. Austin denied an active plan to commit suicide, and the treatment note states that Austin previously discussed suicidal ideations with his parents, and that all firearms were removed from the house. Dr. Schmitt's treatment note states Austin agreed that if his psychiatric condition deteriorated, Austin would tell his parents or contact a crisis unit. Dr. Schmitt was considering a referral for Austin to see a psychiatrist if Austin's condition did not improve. Austin was prescribed anti-anxiety medication for depression and a prescription medication for attention deficit disorder. Austin denied using street drugs or non-prescribed medications.

Dr. Ghaphery's deposition testimony indicates that sometime in September of 2017, Austin admitted to him that he had a drug problem and asked for help. Dr. Ghaphery investigated drug treatment facilities in the area and contacted WTC to arrange an appointment for Austin. Dr. Ghaphery testified that he did not know what drugs Austin was using, and he did not know that WTC only treated opioid addiction. Nevertheless, an appointment was made for Austin to undergo a pre-admission initial assessment at WTC on September 28, 2017. Dr. Ghaphery took Austin to the appointment and testified that he did not believe Austin was a suicide risk when he left him at WTC for the assessment.

---

[2] A "Call Summary Report" dated July 13, 2017, from the Glen Dale Police Department states that Austin was found in a similar condition on two previous occasions after November of 2016. The parties do not identify whether Austin was transported to a medical facility on July 13, 2017.

Austin appeared at WTC for an initial pre-admission assessment, where he underwent a drug screening that was positive for THC and amphetamines.[3] Austin was interviewed by a counselor named Jamie Coen-Pickens and the Medical Director. Ms. Coen-Pickens summarized Austin's assessment in a "Case Note" dated September 28, 2017, which included a summary of the admission screening. The notes confirmed that Austin was not in withdrawal and did not meet the criteria to enroll in the program. He also met with a counselor and the medical director and disclosed he was taking prescription anti-anxiety medicine and agreed to follow up with his doctor the following week.

Ms. Coen-Pickens testified in her deposition that Austin said he previously used illicit drugs, but that he did not have a "current problem," and that he only went to WTC at the request of his parents. According to Ms. Coen-Pickens, Austin was not showing signs of withdrawal, he did not disclose any opioid use, and his drug screen was negative for opioids. Based upon these observations, Ms. Coen-Pickens determined that Austin did not meet the criteria for admission to the medication assisted treatment program operated by WTC.

Ms. Coen-Pickens also testified that Austin admitted to prior suicidal ideations with a plan to use a gun, even though he was not actively suicidal on September 28, 2017. Ms. Coen-Pickens testified that she reported Austin's suicidal ideations to the Medical Director who interviewed Austin. Ms. Coen-Pickens stated that she was present during The Medical Director's and Austin's meeting, and that at the conclusion of the meeting, Austin left the facility because he was not accepted into the program. According to Ms. Coen-Pickens, no efforts were made to refer Austin for inpatient psychiatric treatment because he was prescribed medications by Dr. Schmitt, and Austin agreed to keep his appointment with Dr. Schmitt the following week. Ms. Coen-Pickens did not complete a standard "Patient Screening Form" or a *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* ("DSM-V"), Substance Use Disorder Checklist used by WTC for pre-admission initial assessments.

The Medical Director testified that Austin appeared mildly depressed, but did not show signs of withdrawal, his drug screen was negative for opioids, and Austin denied a history of opioid use. The Medical Director testified that he determined Austin did not exhibit any criteria for an opioid use disorder, and that Austin did not qualify for the medication assisted treatment program. However, the Medical Director testified that Austin admitted to recent suicidal ideations, even though Austin assured the Medical Director that he was not actively suicidal on September 28, 2017. The Medical Director explained to Austin that he should continue seeing Dr. Schmitt, who was treating Austin's depression. According to the Medical Director, he did not make any diagnosis in Austin's case because he was not accepted to participate in WTC's medication assisted treatment

---

[3] The Medical Director would later testify at a deposition that the amphetamine detected in Austin's drug screen was likely from the prescribed anti-depression medication.

program. Austin left WTC after stating that he would keep his appointment with Dr. Schmitt.

When Dr. Ghaphery retrieved Austin from WTC, Austin stated that he was not accepted into the program, and that the Medical Director said he was "fine." Dr. Ghaphery stated that he did not inquire why Austin was not accepted or whether he was still using drugs. Dr. Ghaphery testified that he never inquired about Austin's drug use or saw Austin in an impaired state after the WTC assessment. Moreover, Dr. Ghaphery never tried to arrange treatment for Austin with a different type of provider.

Austin kept his appointment with Dr. Schmitt on October 5, 2017. Dr. Schmitt's treatment note for that date states the reason for Austin's appointment was depression. Austin again denied using illicit drugs, and he denied suicidal ideations. Austin was characterized as "much improved," but he was diagnosed with depression. No changes were made to his medications, and he was cautioned to call Dr. Schmitt if his condition worsened and call a crisis unit if he had more suicidal ideations.

On October 13, 2017, Dr. Ghaphery called Dr. Schmitt's office to refill Austin's medications.[4] According to a "phone note" from Dr. Schmitt's office, Dr. Ghaphery characterized Austin as doing better, and Dr. Schmitt increased Austin's anti-depression prescription drug dosage. Dr. Schmitt's deposition testimony indicates Austin never admitted a drug use problem, and that had he informed him of a drug problem, he would have provided counseling.

On November 3, 2017, Austin was found dead in Dr. Ghaphery's home. An autopsy was performed by the West Virginia State Medical Examiner's Office on November 4, 2017. Toxicology indicated Austin had fentanyl, norfentanyl, heroin, amphetamines, and cocaine in his system. Austin's death was determined to be accidental.

After Austin's death, Dr. Ghaphery, as the personal representative of Austin's estate, instituted this civil action pursuant to the MPLA in the Circuit Court of Ohio County. According to the complaint, WTC and its Medical Director did not adhere to the appropriate standard of care by failing to properly assess Austin's suicide risk, and that said failure to properly assess Austin and refer him to a psychiatric facility proximately caused Austin's death. The complaint also alleges that WTC breached the appropriate standard of care by failing to follow accepted policies and procedures related to the assessment of Austin's eligibility for the medication assisted treatment program and that this failure and the failure to enroll Austin into the program proximately caused his death.

---

[4] Austin authorized Dr. Schmitt's office to speak with his parents regarding the treatment he was receiving.

4

After the complaint was filed, discovery commenced, and Dr. Ghaphery disclosed medical experts who purportedly would testify at trial that the breaches of care outlined in the complaint proximately caused Austin's death. Dr. Ghaphery's medical expert, William Santoro, M.D., testified at deposition that the WTC and its Medical Director breached the applicable standard of care by failing to properly conduct the pre-admission initial assessment to determine whether Austin met the criteria for admission to the program. According to Dr. Santoro, because the drug screen given to Austin did not detect fentanyl/opioids, the standard of care required the Medical Director and Ms. Coen-Pickens to question Austin more thoroughly, and that had they conducted a proper investigation, Austin would have been accepted into the program and likely would not have died of an overdose on November 3, 2017.

Dr. Ghaphery also pursued a theory that WTC and its Medical Director failed to meet the standard of care when assessing Austin's suicide risk. According to Dr. Ghaphery's expert, Richard Goldberg, M.D., WTC and its Medical Director improperly assessed Austin's suicide risk, drug problem, and depression. Dr. Goldberg testified that Austin was at a heightened risk of suicide when he was assessed at WTC, and the standard of care required that Austin be properly assessed and referred to a psychiatric facility for treatment. Dr. Goldberg believed that if the Medical Director and Ms. Coen-Pickens had conformed with the applicable standard of care, Austin would have been transferred to a psychiatric facility and he likely would not have died of an overdose on November 3, 2017.

On September 12, 2022, approximately two weeks before the September 26, 2022, trial, WTC and its Medical Director Dr. Schultz filed "Defendants' Bench Brief – Requirement of Court to Determine Duty as a Matter of Law." In their brief, WTC and its Medical Director argued that they had no duty to accept or treat Austin as a patient on September 28, 2017, so long as there was no discriminatory intent, and that no physician-patient relationship was established between the parties.

On September 21, 2022, the circuit court issued a "Revised Order Granting Defendants' Motion for Summary Judgment and Finding that Defendants had No Duty to Accept or Treat the Decedent, Austin Ghaphery." The circuit court found that Austin was technically a patient at WTC during his pre-admission initial assessment on September 28, 2017, but that no health care provider-patient relationship was established. The circuit court relied on *Gooch v. W. Va. Dept. of Pub. Safety*, 195 W. Va. 357, 465 S.E.2d 628 (1995), and determined that Austin was not a patient pursuant to the MPLA, that WTC and its Medical Director owed no duty of care towards Austin, and that WTC and its Medical Director had no legal duty to accept Austin as a patient for treatment or a duty to perform a suicide risk evaluation and refer him to a psychiatric facility. The circuit court summarized that there "is no duty of care owed to every person who is screened but not accepted for treatment as a patient, and, in this case, is never treated as a patient and who is never seen again." Dr. Ghaphery now appeals the circuit court's September 21, 2022, order to this Court.

5

"A circuit court's entry of summary judgment is reviewed de novo." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of law." *Id.* at Syl. Pt. 2. Moreover, "[s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 2, *Williams v. Precision Coil Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995).

The personal representative argues five assignments of error. However, his fifth assignment of error accurately describes the scope of this case: "The Circuit Court erred in finding that because Austin . . . was ultimately denied admission to Wheeling Treatment Center's [medication assisted treatment program] and released from the facility, no healthcare provider-patient relationship existed between [Wheeling Treatment Center and Dr. Schultz] and Austin . . . sufficient to give rise to a duty of care . . . ." Without the "duty" as described in the fifth assignment of error, WTC and its Medical Director were not required to adhere to a standard of care towards Austin, whether it is the alleged standard of care when providing him a pre-admission initial assessment or the alleged standard of care when assessing his suicide risk.

For Dr. Ghaphery to establish that WTC and its Medical Director owed a duty of care to Austin, he must show that the pre-admission initial assessment provided to him on September 28, 2017, falls under the MPLA. The MPLA, as drafted by the legislature, is intended to be interpreted broadly. However, the MPLA does not govern all litigation related to health care providers, health care facilities, and their staffs. "Though written broadly, the MPLA is nonetheless applicable only in the concept of 'health care' and not intended to preempt every conceivable claim which might occur between a patient and a medical provider that is unrelated to health care." *Cunagin ex rel. J.C. v. Cabell Huntington Hosp., Inc.*, No. 3:19-0250, 2020 WL 6216830, *6 (S.D.W. Va. Oct. 22, 2020).

As with all medical negligence claims, this Court must analyze the MPLA's statutory construction when determining the issues presented by the parties. "When examining a statute to determine its meaning, this Court has held that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature . . . . Further, [a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." *State ex rel. W. Va. Univ. Hosps., Inc. v. Scott*, 246 W. Va. 184, 192, 866 S.E.2d 350, 358 (2021) (citations omitted).

The MPLA defines "medical professional liability" as:

any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient. It also means other claims that may be contemporaneous to or related to the alleged tort or breach of contract or otherwise provided, all in the context of rendering health care services.

W. Va. Code § 55-7B-2(i) (2022).[5]

There is no dispute that WTC and its Medical Director are health care providers. For purpose of this decision we find Austin presumably received extremely limited "health care" during his pre-admission initial assessment to determine whether he was an appropriate candidate for the medication assisted treatment program. West Virginia Code § 55-7B-2(e) lists various definitions of "health care." The definition most relevant to this case is West Virginia Code § 55-7B-2(e)(1) which defines health care as "[a]ny act, service, or treatment provided under, pursuant to, or in furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis, or treatment . . . ."

The Supreme Court of Appeals of West Virginia previously addressed whether initial evaluations by a general medical practice were "health care" pursuant to the MPLA and answered in the affirmative. In *Minnich v. MedExpress Urgent Care, Inc.*, 238 W. Va. 533, 796 S.E.2d 642 (2017), Mr. Minnich fell in an examination room after an initial medical intake but before he was seen by a MedExpress health care provider. He filed suit against MedExpress, which defended the case by arguing that the allegations as set forth in the complaint implicated the MPLA because the complaint emphasized Mr. Minnich's medical condition, and the health care provided by MedExpress in the moments before to the fall. Mr. Minnich argued that his case was nothing more than a simple premises liability claim that did not implicate health care or the MPLA. *See id.* at 535-536, 796 S.E.2d at 644-645.

The Supreme Court of Appeals determined the MPLA applied. In its analysis, one of the issues addressed was whether MedExpress' initial assessment of Mr. Minnich before the fall was "health care" pursuant to the MPLA. The Supreme Court wrote the following:

Integral to the diagnosis and examination of a patient by a medical professional is the component of the health care visit that customarily precedes the actual physical examination. Absent the intake aspect of a patient's visit to a health care provider, the examination would not be as properly focused or as likely to result in a correct diagnosis. Consequently, we have little difficulty viewing the questioning by [the health care provider] of the [plaintiff] and the taking of vital signs that occurred prior to the fall as

---

[5] Stylistic changes were made to West Virginia Code § 55-7B-2 in 2022.

transpiring during the course of or "within the context of the rendering of medical services" . . . The [plaintiff's] attempt to exclude any injuries sustained by a patient before a doctor or nurse enters the examination room, but after a medical history and intake have been taken, from the reach of the MPLA is unavailing.

*Minnich*, 238 W. Va. at 538, 796 S.E.2d at 647 (quoting *Gray v. Mena*, 218 W. Va. 564, 570, 625 S.E.2d 326, 332 (2005)).[6] Therefore, as described in the complaint and arguments before this Court, Austin's pre-admission initial assessment was presumably "health care" within the meaning of the MPLA.

The final issue that must be addressed when determining if WTC and its Medical Director owed a duty of care to Austin on September 28, 2017, is whether he was a "patient" within the meaning of the MPLA. West Virginia Code § 55-7B-2(m) defines a "patient" as "a natural person who receives or should have received health care from a licensed health care provider under a contract, express or implied."

If Austin was a patient within the meaning of the MPLA, a duty of care would arise from the physician-patient relationship:

"The essence of a medical malpractice action is a physician-patient relationship." Generally, it is axiomatic that unless such a relationship is established a legal duty cannot exist between the parties. Similarly, we find that to maintain an action against a hospital a patient must present sufficient facts to create a genuine issue of whether a hospital-patient relationship existed. Without sufficient evidence of such a relationship, a plaintiff fails to meet an essential element of the case and summary judgment is appropriate.

*Gooch*, 195 W. Va. at 366, 465 S.E.2d at 637 (quoting *Rand v. Miller*, 185 W. Va. 705, 706, 408 S.E.2d 655, 656 (1991)). The circuit court below ruled that Austin was "technically a 'patient' [solely] while he was there for the pre-admission assessment . . . ." However, Austin was not a patient of WTC or its Medical Director for purposes of diagnosis or treatment.

WTC and its Medical Director dispensed limited health care during Austin's pre-admission initial assessment. But any health care that was provided to him during the pre-admission assessment was incidental to determining whether he was eligible for enrollment

---

[6] The Legislature amended the definition of health care after the *Minnich* case was decided by the Supreme Court. However, these amendments do not affect the result in this case.

in a special purpose, medication assisted treatment program and was not made under an implied or express contract to provide diagnosis or treatment. In fact, Austin was expressly told that he was ultimately ineligible for admission in the program operated by WTC and its Medical Director, and that he would not be a patient. As a result, no contract, express or implied, was formed between the parties; no health care provider-patient relationship existed between the parties; and WTC and its Medical Director did not owe a duty to provide care to Austin.[7]

As we stated above, the circuit court relied on *Gooch*. In *Gooch*, a West Virginia state trooper transported a DUI suspect to a hospital to draw blood for blood-alcohol content purposes. Mr. Gooch did not complain of illness to either the state trooper or hospital staff, and he was not admitted for care. Mr. Gooch was then incarcerated and two days after his release, Mr. Gooch died of strep pneumonia. Thereafter, Mrs. Gooch, as executrix of Mr. Gooch's estate, brought a civil action alleging that Mr. Gooch was a patient at the hospital, and that the hospital deviated from the standard of care and proximately caused Mr. Gooch's death. *Gooch*, 195 W. Va. at 360-362, 465 S.E.2d at 631-633.

The circuit court granted summary judgment in favor of the hospital and the Supreme Court of Appeals affirmed. *Gooch* explains the physician-patient relationship and how that relationship is based on a contract between the two parties. The *Gooch* Court noted that the health care provider in that case had no reason to believe Mr. Gooch was ill, and that no express or implied contract to provide health care existed. *Gooch*, 195 W. Va. at 369, 465 S.E.2d at 640. This case has similarities to *Gooch* because Austin was also showing no signs that he needed opioid treatment. Austin did not appear intoxicated, was not suffering from withdrawal symptoms, denied illicit drug use, was not in addiction recovery, and told WTC staff he was only there at the behest of his parents. Dissimilar to *Gooch*, but in support of WTC and its Medical Director, Austin was told that he did not meet the criteria for admission, and that he was not a patient.

In this case, there is no question that WTC declined to treat Austin after he was initially screened for admission into a special purpose program. Dr. Ghaphery indicated that when Austin left the WTC offices, he told him that he was not accepted as a patient. Moreover, no evidence was presented that WTC and its Medical Director, provided specific medical advice, or gave a specific diagnosis to Austin. Therefore, no express or

---

[7] The plaintiff in *Minnich* was considered a "patient" for MPLA purposes. However, this case is distinguishable because Austin was specifically told by WTC and its Medical Director that he did not qualify for admission into the program, and that he was not a patient of WTC for purposes of diagnosis and treatment. No such declaration was made by the health care provider in *Minnich*.

implied contract to provide and receive health care was agreed to, and WTC and its Medical Director owed no duty to admit Austin to its medication assisted treatment program.

The personal representative also cites no federal or state statute or rule which imposes a legal requirement on WTC or its Medical Director to admit or treat individuals for opioid addiction or any other diagnosis. The Medication Assisted Treatment Program Licensing Act significantly restricts provider qualification and operations. West Virginia's medication assisted treatment legislative rule does not impose a requirement on facilities to provide healthcare even if an individual meets the criteria for admission. West Virginia Code of State Rules § 69-11-21.8 states that an individual "*may*" be admitted to a medication assisted treatment program if, using accepted criteria, a determination is made that the individual tested positive for opioids or methadone, is showing signs of withdrawal (or both), or is displaying evidence that the individual qualifies under other provisions. In other words, medication assisted treatment facilities are free to decline patients regardless of whether they qualify for opioid treatment and regardless of their mental status.[8]

Finally, the personal representative argues that WTC's Medical Director admitted he had a duty to investigate Austin's suicidal ideations, and that the Medical Director did not follow the appropriate standard of care when he failed to refer Austin to a psychiatric facility. First, the record indicates the Medical Director did not provide medical or psychiatric advice to Austin, other than emphasizing that he should keep his appointment with Dr. Schmitt or contact a crisis center if his mental status deteriorates. This is not medical advice which causes a duty to provide care. Second, the Medical Director's belief that he had a duty to investigate Austin's suicidal ideations was not based on a legal requirement. Austin was not the Medical Director's patient; he was Dr. Schmitt's patient who was actively treating Austin for depression. Finally, WTC and its Medical Director only provide a very specific service: a heavily-regulated medication assisted treatment program solely for those seeking recovery from opioid addiction. They are not general medical practitioners or psychiatrists.

We agree with the circuit court that this is a tragic case. However, there is no genuine issue of material fact that Austin was not a "patient" of WTC or its Medical

---

[8] As discussed in *Gooch*, an example of a statute imposing a duty on a healthcare provider to administer treatment is 42 U.S.C. § 1395dd which requires hospital emergency departments to determine whether a patient has a medical emergency, and if so, requiring the hospital to stabilize the medical condition before transfer or discharge. *Gooch*, 195 W. Va. at 368, 465 S.E.2d 639. No such requirement is imposed on medication assisted treatment facilities under the Medication Assisted Treatment Program Licensing Act which places significant limits on admitting candidates based on concerns about dispensing medications to inappropriate candidates outside a highly regulated, structured recovery program.

Director on September 28, 2017.  Therefore, WTC and its Medical Director owed no duty to provide care to Austin on that date.

Affirmed.

**ISSUED:** November 16, 2023

**CONCURRED IN BY:**

Chief Judge Daniel W. Greear
Judge Thomas E. Scarr
Judge Charles O. Lorensen